# UNITED STATES DISTRICT COURT
### for the
Eastern District of Tennessee

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )    Case No. 1:25-MJ-126
  )
THE CELLULAR TELEPHONE ASSIGNED  )
CALL NUMBER (423) 889-3860  )
  )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A attached and incorporated herein.

located in the _____ Eastern _____ District of _____ Tennessee _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B attached and incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846. | Distribution / conspiracy to distribute a controlled substance |

The application is based on these facts:   See affidavit in support of search warrant.  To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant will also function as a pen register order.  I thus certify that the information likely to be obtained is relevant to an ongoing criminal investigation conducted by ATF.  See 18 U.S.C. §§ 3122(b), 3123(b).

☑ Continued on the attached sheet.

☑ Delayed notice of __90__ days (give exact ending date if more than 30 days: __08/21/2025__ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Franklin P. Clark, Assistant United States Attorney
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____05/23/2025_____

_____
*Judge's signature*

City and state:  Chattanooga, Tennessee

Hon. Mike Dumitru, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number (423) 889-3860 and utilized by Carteious SIVELS also known as "Bird" ("Target Telephone 1/TT1"), whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road Bedminster, New Jersey 07921.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of Verizon Wireless.

## ATTACHMENT B

### Particular Things to be Seized

#### I. Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. 841(a)(1) and Title 21 U.S.C. 846 have been committed by Carteious SIVELS or unidentified subject(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

2

THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

IN THE MATTER OF THE SEARCH OF
THE CELLULAR TELEPHONE ASSIGNED
CALL NUMBER (423) 889-3860

Case No. 1:25-mj- 126

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Thomas Bagwell, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number (423) 889-3860 and utilized by Carteious SIVELS also known as "Bird" ("Target Telephone 1/TT1"), whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road Bedminster, New Jersey 07921. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act. *See* 18 U.S.C. §§ 3121-3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute. *See* 18 U.S.C. § 3123(b)(1).

3.      I am a Special Agent (hereinafter SA) with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter ATF) and have been employed by ATF since January 2019. As such, I am a criminal investigator or law enforcement officer of the United States within the

meaning of Title 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations of, and to make arrests for violations of federal laws, including, but not limited to, Title 21 U.S.C. 841(a)(1) and Title 21 U.S.C. 846. I am currently assigned to the ATF Chattanooga Field Office. I have over nine years of federal law enforcement experience.  Prior to starting my career in federal law enforcement, I served four years in the United States Marine Corps. I also obtained a Bachelor of Science degree with a major in criminal justice from Dalton State College. I am a graduate of the United States Customs and Border Protection Officer Basic Training (CBPOBT), Criminal Investigator Training Program (CITP), Basic Deputy United States Marshal (BDUSM) Academy, and the ATF National Academy's Special Agent Training (SABT) Program, all of which were completed at the Federal Law Enforcement Training Center (FLETC).

4.      As a result of my training and experience in law enforcement, I am familiar with federal criminal laws regarding firearms, explosives, arson, and illegal controlled substances. I have conducted or participated in multiple investigations involving the criminal possession of firearms and the distribution of illegal controlled substances. I have utilized traditional law enforcement techniques, such as surveillance, witness interviews, suspect interviews, execution of search warrants, evidence collection, and controlled purchases of evidence. I have gained insight regarding the habits, practices, methods, and general behavior of individuals engaged in criminal activity through interviewing numerous suspects, cooperating defendants, and confidential informants.

5.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6.     Based on the facts set forth in this affidavit, there is probable cause to believe that violations Title 21 U.S.C. 841(a)(1) and Title 21 U.S.C. 846 have been committed by Carteious SIVELS. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations and will lead to the identification of individuals who are engaged in the commission of these offenses.

## JURISDICTION

7.     The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

8.     The United States, including the ATF, is conducting a criminal investigation of SIVELS regarding possible violations of Title 21 U.S.C. 841(a)(1) and Title 21 U.S.C. 846.

9.     On March 10, 2025, your Affiant and members of the 10th Judicial Drug and Violent Crime Task Force (hereinafter 10th DTF) conducted surveillance at Tina MOWERY's (hereinafter MOWERY) residence located at 1022 15th Street NE Cleveland, TN. Your Affiant and 10th DTF Agent Allen previously received information that MOWERY, a convicted felon, was in possession of firearms and distributing methamphetamine at residence. During surveillance, agents observed a gold Infiniti sedan parked at the residence. The gold Infiniti sedan ultimately departed the residence. Your affiant and 10th DTF Agents surveilled the vehicle from the residence.

10.     While surveilling the gold Infiniti sedan, Agent Wyatt observed the vehicle fail to come to a complete stop at a stop sign located at the intersection of 6th Street NE and Lowery

3

Street NE. Agent Wyatt attempted stop the vehicle due to the traffic violation, but the vehicle sped away at a high rate of speed and Agent Wyatt lost sight of the vehicle. Agent Wyatt eventually caught up to the gold Infiniti sedan around the 3000 block of Bates Pike SE and stopped the vehicle at the intersection of Bates Pike SE and Randolph Samples Road SE.

11. The vehicle was occupied by Nikki BURKE (hereinafter BURKE). Your Affiant and 10th DTF Agents previously received information that BURKE distributed methamphetamine in the Cleveland, TN area. Agent Wyatt advised BURKE of her Miranda rights after detaining her. BURKE provided verbal consent to search the gold Infiniti sedan. While searching the vehicle, Agent Wyatt located a drug ledger, multiple resealable baggies, and a pipe used to ingest methamphetamine. Agents suspected BURKE had thrown evidence out of her window prior to stopping her vehicle, so agents canvassed the route BURKE traveled before she stopped for Agent Wyatt. While searching the travel route, Agent Norfleet located approximately 279 grams (field weight) of suspected methamphetamine and 17 suspected Adderall pills. The evidence was found at the intersection of Bates Pike SE and Old Powerline Road SE.

12. BURKE ultimately admitted to possession and distribution of the suspected methamphetamine and to possession of the Adderall. BURKE also allowed Agent Wyatt to search her mobile device, and Agent Wyatt observed messages indicative of narcotics distribution. BURKE stated that she met a black male known as "BJ" in Chattanooga the day prior and purchased one pound of methamphetamine for $2,600.00. BURKE claimed that "BJ" was who supplied her brother (Lon Daniel BURKE) with methamphetamine. BURKE claimed that she had purchased one pound of methamphetamine every two or three days from "BJ" since her brother went to jail (January 25, 2025). BURKE admitted to selling four ounces of

4

methamphetamine the day prior for $250.00 per ounce. BURKE was not arrested at the time of the incident.

13. On March 24, 2025, your Affiant assisted the 10th DTF and Bradley County Sheriff's Office with a state search warrant at MOWERY's residence located at 1022 15th Street NE Cleveland, TN. MOWERY and BURKE were located inside the residence by law enforcement. While searching the bedroom where BURKE was located, law enforcement found approximately 101.2 grams (field weight) of suspected methamphetamine in a backpack. While searching the living room area where MOWERY was located, law enforcement found miscellaneous pills, suspected marijuana, and approximately 8 grams of suspected methamphetamine. Suspected marijuana and approximately 101.2 grams of suspected methamphetamine (field weight) was found in a safe in MOWERY's bedroom. Law enforcement also found drug related paraphernalia indicative of methamphetamine distribution inside the residence, such as suspected drug ledgers, baggies, a measuring cup, and digital scale.

14. Your Affiant and 10th DTF Agent Thompson advised BURKE of her Miranda rights and interviewed her on scene. BURKE admitted to possession of the methamphetamine found in the backpack. She claimed the methamphetamine was purchased by MOWERY the night prior from a male named "Chris." BURKE claimed that some of the methamphetamine she had on March 10, 2025, was purchased from "Chris" and that some of it was purchased from "BJ." However, prior to being transported to the Bradley County Jail, BURKE claimed that the methamphetamine found in the residence did not belong to her.

15. Your Affiant and 10th DTF Agent Thompson advised MOWERY of her Miranda rights and interviewed her on scene. MOWERY was somewhat reluctant to provide information about who supplied her with methamphetamine but admitted to possession and distribution of

5

methamphetamine. She claimed that "everything" in the residence belonged to her. MOWERY also provided written consent to search her cellular phone.

16. On March 31, 2025, your Affiant and 10th DTF Agent Thompson interviewed Tina MOWERY at the Bradley County Jail. MOWERY was advised of her Miranda rights at the onset of the interview. The following is a synopsis and is not intended to be a verbatim or transcribed account of the interview.

17. MOWERY stated that she started selling methamphetamine around November or December 2024 for financial reasons. She stated she reached out to a friend, later identified as Carteious SIVELS aka "Bird," who supplied her with methamphetamine to sell. MOWERY claimed that when she first started selling methamphetamine, it was "small." She claimed that it was enough to pay her bills. Eventually, she bought half of a pound of methamphetamine for $1,400.00 two or three times a week. She claimed that towards the end, she was selling "quantity." She described "quantity" as 1 to 2 ounces at a time.

18. MOWERY stated that she found out BURKE was going behind her back directly to SIVELS and that they were doing "big business." MOWERY claimed that she severed ties with BURKE after that and that BURKE went to jail. However, after BURKE was released, the two reunited. MOWERY claimed BURKE "moved a lot." MOWERY indicated she and BURKE were collectively buying one pound of methamphetamine together at a time approximately twice a week.

19. MOWERY stated that SIVELS lived in an apartment on North Ocoee Street (Cleveland). MOWERY described SIVELS'S vehicle as an older light blue Chevrolet that she thought might be a Suburban. She claimed SIVELS was a black male. She claimed that

6

SIVELS'S phone number was saved in her phone as "Bird." MOWERY identified the name on his Facebook account as "Tee Bird." MOWERY also identified SIVELS via photograph.

20.     MOWERY stated that the last time she dealt with SIVELS she had to go to his mother's house on Stockland or Stockton drive in Chattanooga. MOWERY claimed that she dealt with SIVELS from November until around early March and stopped using him. MOWERY stated that BURKE had been going to SIVELS and knew him more than she did. MOWERY stated she went to SIVELS'S mother's house in February and that BURKE drove her. MOWERY indicated that SIVELS would leave the methamphetamine in his vehicle for her to get rather than meet her in person. She claimed that she would put money in his vehicle then leave. SIVELS would then call her and tell her where to look in the vehicle, like the backseat or back passenger seat. MOWERY stated that SIVELS was mainly paid cash but that sometimes he was paid through Cash App. MOWERY stated she bought "pounds and pounds" from SIVELS. MOWERY stated that SIVELS changed his phone number but provided his old number, (423) 432-2474. She claimed that she always spoke to him on messenger (Facebook). MOWERY stated that SIVELS did not like to text and that they usually spoke on the phone.

21.     MOWERY stated that she and BURKE purchased methamphetamine from Christopher "Chris" TOWERS the night before the search warrant occurred. She stated BURKE told her to text TOWERS, so she contacted him on messenger. She identified the name on his Facebook account as "Chris Towers." MOWERY claimed that she and BURKE were supposed to have purchased 3.5 ounces of methamphetamine from TOWERS to split. She indicated that she gave $400.00 to BURKE who purchased the methamphetamine from TOWERS in the bedroom where BURKE slept. MOWERY said she originally met TOWERS through Curtis

7

Collier and Edmund James and indicated that she had sold him methamphetamine in the past. MOWERY also identified TOWERS via photograph.

22. On April 1, 2025, your Affiant drove by 6226 Stockton Drive Chattanooga, TN, which is the address listed on SIVLES's Tennessee driver's license. Your affiant observed a light blue Chevrolet Trailblazer parked in the carport at the residence.

23. On April 3, 2025, your Affiant received information from Drug Enforcement Administration (hereinafter DEA) SA Wise. SA Wise advised that a confidential informant provided cellular phone number (423) 889-3860 for SIVELS. The confidential informant advised SA Wise that SIVELS lived in Cleveland but would go to a house off Bonny Oaks Drive. The confidential informant claimed that a female driving a blue and/or purple van would deliver for SIVELS. The confidential informant advised SA Wise that SIVELS had recently asked him/her for a resale amount of methamphetamine.

24. On April 4, 2025, your Affiant performed a public search of Facebook account https://www.facebook.com/tee.bird.5623 vanity name "Tee Bird" and observed multiple photographs of SIVELS. Your affiant also observed that Nikki Burke and Tina McNabb MOWERY were listed as "friends" on the account.

25. On April 7, 2025, your Affiant and Agent Thompson interviewed Nikki BURKE at the Bradley County Jail after learning that BURKE wanted to talk. Agent Thompson advised BURKE of her Miranda rights at the onset of the interview. BURKE acknowledged that she understood her rights. The following is a synopsis and is not intended to be a verbatim or transcribed account of the interview.

26. BURKE claimed that she started selling methamphetamine around the end of December (2024) when she started going over to "Tina's." She claimed she had relapsed and

8

Case: 1:25-mj-00026-MJD SEALED Document Document Filed 05/23/25 *SEALED* Page 12 Filed 05/23/25 Page 12 of 28    PageID #: 20

initially bought a "ball" (3.5 grams) at a time from MOWERY and "started getting big time after that." BURKE stated that she started going to MOWERY's supplier who she knew as Tee Bird aka Bird. MOWERY previously identified Tee Bird as Carteious SIVELS. BURKE described Tee Bird as a black male but did not know his real name. BURKE claimed that Tee Bird would stay in Cleveland or in Chattanooga at his mother's.

27.     BURKE claimed that up until recently, SIVELS would not deal with her in person. BURKE claimed that she would take her money and MOWERY's money, which would be around $2,400.00, and place it in the backseat of SIVELS'S vehicle then get the "dope" (methamphetamine) and leave. She claimed this is when she started selling lager amounts of methamphetamine around January (2025) after MOWERY asked BURKE if she wanted to start putting their money together. BURKE claimed that MOWERY would basically match whatever money BURKE could contribute to purchasing methamphetamine then the two would split whatever they bought.

28.     BURKE estimated that she and MOWERY were buying $1,200.00 worth of methamphetamine at a time; however, she stated that if she and MOWERY did not have $2,400.00 for 1 pound of methamphetamine, she and MOWERY would pay for half of a pound then SIVELS would front the remaining half to MOWERY. BURKE indicated that she liked this because she could just go straight to MOWERY if she sold out and not to SIVELS. BURKE estimated that she was buying 3-4 ounces a week at the beginning of January. By mid-February, BURKE claimed she was selling around 5-6 ounces per day.

29.     BURKE described the apartments where SIVELS lived on North Ocoee Street in Cleveland. BURKE believed SIVELS had an upstairs apartment because he could see her coming and going. She described his vehicle as a "blazer." BURKE recalled seeing blazer

9

written on the vehicle and said it was silver with "a blue tint to it." BURKE claimed that she had taken MOWERY to SIVELS'S mother's home in Chattanooga. Based on the directions BURKE provided, your Affiant determined she was describing the residence MOWERY had previously identified on Stockton Drive. BURKE claimed she had taken MOWERY to the Chattanooga residence 5-6 times. When asked how many times she picked up from North Ocoee in Cleveland, BURKE replied, "a lot." BURKE identified SIVELS via photograph.

30. BURKE stated that the methamphetamine she threw out of her window on March 10, 2025, came from Christopher "Chris" TOWERS. She originally stated that the methamphetamine came from an unidentified black male named "BJ." BURKE claimed that "BJ" did exist and that it was Lon BURKES' supplier. BURKE stated that she only bought from "BJ" 2-3 times. BURKE stated that she met "BJ" with Amethyst Patterson twice. She claimed that she took $2,300.00 worth of methamphetamine but the methamphetamine deal did not happen. She stated Patterson bought fentanyl though. On the second trip, BURKE bought 30 grams of methamphetamine from "BJ." BURKE claimed that She had also met "BJ" with her brother, Lon BURKE. She claimed that Lon BURKE bought fentanyl, as well as some methamphetamine for her to try.

31. BURKE claimed that she had only dealt with TOWERS twice. She stated that she purchased "6" (ounces) of methamphetamine from TOWERS the night before she was stopped on March 10, 2025. She stated that the rest of the methamphetamine was purchased from MOWERY, who had purchased it from TOWERS. The second occasion she dealt with TOWERS was the night before the search warrant that occurred at MOWERY's residence on March 24, 2025. BURKE later indicated that MOWERY met TOWERS through Curits Collier. She claimed that she and MOWERY had purchased "3.5" ounces together from TOWERS.

10

BURKE stated the methamphetamine that was found in the bedroom where she was sleeping belonged to MOWERY. She stated that she could not get into MOWERY's safe to put it up so she kept it with her so no one would mess with it while MOWERY was sleeping. She believed that the methamphetamine found in the bedroom came from "Jason" (Jason Smith) or "Juice" (Alexander Porter) because they also came to MOWERY's the night before the search warrant occurred.

32. On April 23, 2025, Agent Thompson applied for a state search warrant authorizing the installation and use of a pen register/trap and trace and collection of location information for Verizon Wireless telephone number (423) 889-3860. Bradley County Criminal Court Judge Donaghy granted Agent Thompson the search warrant. The search warrant was subsequently executed on Verizon Wireless.

33. On April 24, 2025, at approximately 10:26 hours, your Affiant began receiving global positioning system (GPS) locations for Carteious SIVLES' cellular phone, phone number (423) 889-3860. The location of the cellular phone was within the radius of the apartments located at 3620 North Ocoee Street Cleveland, TN. Your Affiant and 10th DTF Agent Thompson previously received information that SIVELS resided at the apartments.

34. At approximately 12:25 hours, the cellular phone was located within the radius of the residence located at 6226 Stockton Drive Chattanooga, TN. At approximately 14:54 hours, your Affiant observed that the cellular phone was in the Ooltewah area, indicating that the cellular phone appeared to be moving north from Chattanooga to Cleveland.

35. At approximately 15:10 hours, 10th DTF Agent Norfleet and TFO Kienlen established surveillance at 3620 North Ocoee Street. At approximately 15:11 hours, your Affiant observed that the cellular phone was in the Cleveland area. At approximately 15:20 hours, Agent

11

Case 1:25-mj-00026-MJD *SEALED* Document 1 *SEALED* Filed 05/23/25 Page 15 of 28 PageID #: 23

Norfleet observed a black Ford Edge arrive at the apartments. A black male driver exited the driver side of the vehicle and went into the apartment complex. A white female exited the passenger side, moved to the driver seat, and departed the location. At approximately 15:25 hours, the cellular phone was located within the radius of the apartments located at 3620 North Ocoee Street.

36. TFO Kienlen determined that the Tennessee license plate on the vehicle was 102BNHN. The vehicle was registered to Amanda Frazier (W/F, DOB: 09/07/1982). ATF Intelligence Research Specialist Fraser previously identified Frazier's girlfriend, Kayla ELLIOTT, as SIVELS associate based on incoming and outgoing calls to SIVELS'S cellular phone. The vehicle was surveilled to Frazier's residence located at 341 Laurel Bluff Road SW Cleveland, TN. It arrived at approximately 15:37 hours.

37. On April 30, 2025, Agent Norfleet observed a black male matching SIVELS'S description arrive at the apartments located at 3620 North Ocoee Street. The black male arrived in an Orange Kia Sol bearing Tennessee license plate BSM4253 and was observed entering an apartment. Your affiant reviewed the location of SIVELS'S cellular phone after the black male arrived and determined it was within the radius of the apartments. It had not been prior to the black male's arrival.

38. Law enforcement established surveillance at the residence. Eventually, a white female, later identified as Angela Sis-Crutcher exited the same apartment, placed an item in the passenger seat and departed the apartment parking lot. Sis-Crutcher was stopped by Bradley County Sheriff's Office for a traffic violation and consented to a search of the Kia Sol. The search yielded negative results.

12

Case: 1:25-mj-00026-MJD SEALED Document Document Filed 05/23/25 *SEALED* Page 16 Filed 05/23/25 Page 16 of 28 PageID #: 24

39. On May 1, 2025, your Affiant and TFO Kienlen interviewed Christopher TOWERS at his residence located at 2398 Interlackin Circle NW Cleveland, TN following the execution of a state search warrant at the residence. The interview pertained to his involvement in the distribution of methamphetamine in the Cleveland area. The following is a synopsis and is not intended to be a verbatim or transcribed account of the interview with TOWERS.

40. TOWERS acknowledged that he had been advised of his Miranda rights at the onset of the interview; however, your Affiant advised TOWERS of his Miranda rights a second time. TOWERS agreed to speak with your Affiant. TOWERS claimed he was on misdemeanor probation and was not a convicted felon.

41. TOWERS estimated that he was in possession of 5 or 6 grams of methamphetamine when he was encountered by law enforcement earlier that morning. He claimed that there was no methamphetamine inside the residence.

42. TOWERS claimed that he does not "necessarily" sell methamphetamine. He claimed that he would buy some to use but that he would sell methamphetamine to a friend if they stopped by and wanted some. He claimed that he was not "out here trying to be a drug dealer." TOWERS claimed that he would not sell more than an "8 ball (3.5 grams) or so" at a time. He stated that he sold methamphetamine to "support his habit." TOWERS stated that he charged $50.00 per "8 ball" and explained that some days he may not sell any methamphetamine and others he might sell one or two "8 balls" per day. TOWERS claimed that the most methamphetamine he had sold at one time was probably an "ounce or so."

43. TOWERS admitted that he had purchased methamphetamine from Tina MOWERY. TOWERS claimed that he met MOWERY through Curtis Collier 3 or 4 months prior at her residence on 15th Street. TOWERS claimed that he would buy a ½ ounce of

13

methamphetamine from MOWERY at a time. When asked how often, TOWERS stated he only went over to MOWERY's a "handful of times." TOWERS stated the most he had purchased from MOWERY was a ½ ounce and believed she charged $125.00. TOWERS claimed Nikki (BURKE) was at MOWERY's residence sometimes but that he never dealt with her. TOWERS claimed that he typically contacted MOWERY through Facebook and would ask if he could stop by.

44. TOWERS also admitted that MOWERY had bought methamphetamine from him before. SA Bagwell described Facebook messages between MOWERY and TOWERS the night before the search warrant that occurred at MOWERY's residence on March 24, 2025, and asked TOWERS how much methamphetamine he had sold her that night. TOWERS estimated that he sold MOWERY 1 ½ ounces of methamphetamine and that she also wanted 1 ounce of methamphetamine for BURKE. TOWERS stated that was the only time he had sold MOWERY methamphetamine. TOWERS claimed he charged $625.00 for the 2 ½ ounces. TOWERS later denied selling BURKE the methamphetamine she had in her possession on March 10, 2025. TOWERS also provided information about his methamphetamine suppliers.

45. Later that evening, your Affiant reviewed the location of SIVELS'S cellular phone and determined it had moved from Cleveland to Chattanooga and was located with the radius of the residence located on Stockton Drive.

46. On May 6, 2025, your Affiant conducted a "spot-check" at the residence located at 6226 Stockton Drive after determining that SIVELS'S cellular phone was located within the radius of the residence. Your Affiant observed a light blue Chevrolet Trailblazer parked in the carport of the residence. At approximately 12:50 hours, SA Saint-Louis conducted surveillance at 6226 Stockton Drive and observed a black Ford Edge arrive at the residence and park in the

14

driveway. A short time later, SA Saint-Louis observed the vehicle leaving the residence then lost sight of the vehicle. SA Saint-Louis relocated the vehicle a short distance away at the Shell gas station located at 6506 Bonny Oaks Drive. The vehicle departed the Shell and traveled east on Bonny Oaks Drive toward Interstate 75.

47. At approximately 13:08 hours, Investigator Serret with Chattanooga Housing Authority stopped the black Ford Edge bearing Tennessee License plate 102BNHN on the Interstate 75 Northbound entrance ramp after he observed the vehicle fail to maintain lane. Investigator Serret identified the driver and sole occupant of the vehicle as Kayla ELLIOTT. ELLIOTT informed Investigator Serret that she did not have a driver's license. Investigator Serret asked ELLIOTT to exit the vehicle and advised her of her Miranda rights. ELLIOTT advised Investigator Serret that she did not have anything illegal in her possession and that there should not be anything illegal inside the vehicle. ELLIOTT provided verbal consent to Investigator Serret to search the vehicle. While searching the vehicle, Investigator Serret located a suspected marijuana blunt, drug related paraphernalia, approximately 2 ounces of suspected methamphetamine (field weight) and $831.00.

48. Your Affiant responded to the scene and interviewed ELLIOTT. ELLIOTT acknowledged that she had been advised of her Miranda rights; however, your Affiant advised of her Miranda rights a second time. The following is a synopsis and is not intended to be a verbatim or transcribed account of the interview with ELLIOTT. ELLIOTT claimed that she dropped her aunt off at North Park Emergency Room then went to her friend's house. When asked what her friend's name was, ELLIOTT stated "Bird." ELLIOTT described "Bird" as a black male with dreads. ELLIOTT stated that when "Bird" was in Chattanooga, he would stay at his mother's residence on Stockton Drive. When he was in Cleveland, he stayed at a place on

15

North Ocoee Street. ELLIOTT stated that she did not know the numeric address for the residence on Stockton Drive but that there was a "blue Chevy Blazer" parked underneath the carport that belonged to him. ELLIOTT provided accurate directions from Bonny Oaks to the residence on Stockton Drive, claiming that after turning on Canyon (Drive) you would drive over a speed bump then turn left on the next road and the house would be on the left. ELLIOTT stated that she stopped at the gas station to put air in her tire after leaving "Bird's" residence and that she was getting on the interstate to go home.

49. ELLIOTT stated she was in possession of 2 ounces of methamphetamine when she was traffic stopped. She claimed that the methamphetamine was in her front seat, which is where the methamphetamine was found by Investigator Serret. ELLIOTT claimed that she picked the methamphetamine up from "Bird" for someone else. ELLIOTT stated that "Bird" left the methamphetamine in a brown box in the carport. When asked how "Bird" was paid for the methamphetamine, ELLIOTT stated the person she was taking it to had paid "Bird" via Cash App.

50. When asked how she was instructed to come to Chattanooga to pick up the methamphetamine, ELLIOTT claimed that she had known "Bird" for a long time and that she used to buy "weed" from him, implying that "Bird" trusted her. ELLIOTT claimed the methamphetamine was for Donna Nichols (correct spelling unknown) but did not know if that was her real name. ELLIOTT stated she would know where she was going to meet Nichols until she returned to Cleveland then would contact her via Facebook. Your Affiant asked if Nichols would come to ELLIOTT's residence on Laurel Bluff, and she stated, "yeah." ELLIOTT stated Nichols drove a gray compact Sport Utility Vehicle (SUV). ELLIOTT claimed that all the

16

methamphetamine was for Nichols and that none of it was hers; however, she did admit that she had recently relapsed.

51. ELLIOTT stated that the last time she had bought methamphetamine from "Bird" for herself was "about the first of the year." ELLIOTT claimed she purchased the methamphetamine from "Bird" at the residence on Stockton Drive." When asked to describe what occurred that day, ELLIOTT stated that she "pulled up in his driveway and he just came out." She estimated that she purchased "a gram or two" or maybe an "8 ball" (3.5 grams) of methamphetamine from "Bird" that day.

52. ELLIOTT stated "Bird" supplied methamphetamine to one other person in Cleveland. She claimed her name was Stephanie Smith. ELLIOTT claimed Smith would come to Chattanooga to "get" from "Bird." ELLIOTT described Smith's vehicle as a bright or metallic blue Mazda.

53. When asked how often she would pick up methamphetamine from "Bird," ELLIOTT stated," maybe once every two weeks." ELLIOTT stated "Bird's" methamphetamine supplier lived in a residence on "Lightfoot" or "Lighthill" road in Chattanooga. She described his supplier as a black male with dreads and stated he drove a gray Tahoe. ELLIOTT claimed that "Bird" took her over to his supplier's residence two or three weeks prior.

54. ELLIOTT stated she had been picking up methamphetamine since "Tina and Nikki got busted." ELLIOTT estimated she started around the beginning of April. She claimed that all of her "runs" were to Chattanooga because "his people were down here" (supplier). ELLIOTT claimed she picked up the same amount (2 ounces) the last time she traveled to Chattanooga. When asked if she had ever picked up more than 2 ounces, ELLIOTT stated "maybe once, it might have been 4" the time she and "Bird" went to his supplier's residence

17

around 3 weeks prior. ELLIOTT claimed that she picked "Bird" up at Stockton Drive and he claimed they needed to go to his supplier's residence. ELLIOT reviewed a photograph of SIVELS and identified him as the person she knew as "Bird."

55.     Your Affiant obtained written consent from ELLIOTT to search her blue Apple iPhone 13. ATF Task Force Officer Kienlen reviewed and photographed instant messages between ELLIOTT and a contact saved in her iPhone as "Bird." The phone number listed for "Bird" was (423) 889-3860.

56.     On May 7, 2025, your Affiant reviewed the instant messages photographed by TFO Kienlen. On April 24, 2025, ELLIOTT asked "Bird" what his mother's address was. He replied 6224 Stockton Drive. On April 26, 2025, "Bird" messaged ELLIOTT "650 for 4." Prior to the traffic stop, ELLIOTT messaged "Bird" stating she needed "2 of the pink." She later advised "Bird" she was on her way, and he replied "ok." Prior to her arrival, she messaged "Bird" that she was passing Ooltewah.  Your Affiant also reviewed the location of SIVELS'S cellular phone and determined it was within the radius of 6226 Stockton Drive around the time the Black Ford Edge arrived at the residence.

57.     In my training and experience, I have learned that Verizon Wireless is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including E-911 Phase II data, also known as GPS data or latitude-longitude data and cell-site data, also known as "tower/face information" or cell tower/sector records. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data

18

from several of the provider's cell towers. [Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

58. Based on my training and experience, I know that Verizon Wireless can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available.

59. Based on my training and experience, I know that Verizon Wireless can collect cell-site data about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as Verizon Wireless typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

19

Case 2:25-mj-00026-MJD *SEALED* Document 6 *SEALED* Filed 05/23/25 Page 19 of 28 PageID #: 31

## AUTHORIZATION REQUEST

60. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

61. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

62. I further request that the Court direct Verizon Wireless to disclose to the government any information described in Attachment B that is within the possession, custody, or control of Verizon Wireless. I also request that the Court direct Verizon Wireless to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information described in Attachment B unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference

20

points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

63. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cell Phone outside of daytime hours.

64. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Thomas Bagwell
Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives

Subscribed and sworn to before me on ___May 23___, 2025

MIKE DUMITRU
UNITED STATES MAGISTRATE JUDGE

21

# ATTACHMENT A

## Property to Be Searched

1. The cellular telephone assigned call number (423) 889-3860 and utilized by Carteious SIVELS also known as "Bird" ("Target Telephone 1/TT1"), whose service provider is Verizon Wireless, a wireless telephone service provider headquartered at 180 Washington Valley Road Bedminster, New Jersey 07921.

2. Records and information associated with the Target Cell Phone that is within the possession, custody, or control of Verizon Wireless.

# ATTACHMENT B

## Particular Things to be Seized

### I. Information to be Disclosed by the Provider

All information about the location of the Target Cell Phone described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of Verizon Wireless, Verizon Wireless is required to disclose the Location Information to the government. In addition, Verizon Wireless must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with Verizon Wireless's services, including by initiating a signal to determine the location of the Target Cell Phone on Verizon Wireless's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate Verizon Wireless for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to Be Seized by the Government

All information described above in Section I that constitutes evidence of violations of Title 21 U.S.C. 841(a)(1) and Title 21 U.S.C. 846 have been committed by Carteious SIVELS or unidentified subject(s).

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

2